UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| MICHELLE MESSER as ADMINISTRATRIX of the ESTATE OF WILMER MESSER, deceased, <br><br> Plaintiff, <br><br> v. <br><br> INDIANA STATE POLICE, CHAD LARSH, in his individual capacity, and KEVIN MEYROSE, in his individual capacity, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CAUSE NO. 4:06-CV-0022 AS APR <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION & ORDER

This matter is before the Court on the Motion for Summary Judgment (Doc. No. 38) filed by the Defendants Indiana State Police, Chad Larsh, in his individual capacity, and Kevin Meyrose, in his individual capacity (collectively "Defendants"). Plaintiff, Michelle Messer ("Plaintiff" or "Ms. Messer"), as administratrix of the estate of Wilmer Messer, deceased, responded to the Motion for Summary Judgment and filed a Rule 12(f) Motion to Strike Factual Evidence (Doc. No. 47). Defendants also filed a Rule 56 Motion to Strike Inadmissible Hearsay (Doc. No. 50). Oral arguments were heard on these motions in Lafayette, Indiana on October 20, 2008, in which the lawyer for the Plaintiff's estate in this case made some very appealing arguments about equity and fairness. Certainly those values adhere in the process here involved.

For the reasons set forth below, Plaintiff's Motion to Strike is **GRANTED IN PART AND DENIED IN PART**, Defendants' Motion to Strike is **DENIED**, and Defendants' Motion for Summery Judgement is **GRANTED**.

## I. INTRODUCTION

On March 1, 2006, Plaintiff brought suit against Chad Larsh and Kevin Meyrose, in their individual capacities, the Indiana State Police, and Orville J. Perry, Jasper County Sheriff (Doc. No. 1). Plaintiff filed a First Amended Complaint ("Amended Complaint") on November 17, 2006 (Doc. No. 19), asserting claims under 42 U.S.C. §§ 1983 and 1988 alleging violations of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and alleging violations of Article I §§ 11, 15, and 16 of the Indiana State Constitution and substantive law of Indiana. An Order dismissing the Defendant, Orville J. Perry, Jasper County Sheriff, was entered on August 6, 2007 (Doc. No. 35). The Court now considers the remaining motions.

## II. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The moving party bears the burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" that the moving party believes demonstrate an absence of genuine issue of material fact. *Celotex Corp.*, 477 at 323. Once this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th

Cir. 1989). "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment may be proper.

## III. FACTUAL BACKGROUND

This matter regards events leading up to the death of Wilmer Messer ("Mr. Messer") on August 17, 2005, in Jasper County, Indiana. Ms. Messer was not present to witness that event. (Messer Depo., p. 68). While noting the caution that must be taken where the only witness for Plaintiff, Mr. Messer, is now deceased, the Court sets forth the facts enumerated by each officer who responded to the incident. *See Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994) (affirming summary judgment in favor of the officer and the county for an excessive force claim and noting that the award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify and the only person likely to contradict the officer is beyond reach). Thus, this Court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements, and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial. *Id.*

Declaration of Deputy Richard Trail and Statements of Trooper Aaron Correll, Trooper Scott Krueger, Trooper Brian McCall, and ISP Sergeant Tim Isenberg

At approximately 8:09 p.m. on August 17, 2005, Jasper County Sheriff Deputy Richard Trail ("Trail") received a radio dispatch requesting officers to respond to the Family Express gas station,

located at State Roads 10 and 49, on a report of an intoxicated male[1] who informed a Family Express patron that he was going to burn his house down, that he possessed a shotgun and an AK-47 in his truck, and that he wanted to see what the county boys [officers] had. Trail, along with Jasper County Reserve Deputy Aaron Agent, and Indiana State Troopers Scott Krueger ("Krueger"), Brian McCall ("McCall"), and Aaron Correll ("Correll"), responded to the call. On the way to the Family Express, radio communication from dispatch advised that the Dodge pickup truck's license plate revealed ownership by Michelle Messer, residing at 4885 N. 100 West ("Messer residence"), and further reported that the truck was being driven recklessly and wrecked into a ditch at 100 West, which is north of County Road 400 North, near the Messer residence.

Once in front of the Messer residence in marked patrol cars, Trail and Correll testified to observing a white male, later identified as Wilmer Messer, standing off the roadway holding a shotgun. As Trail and Agent's vehicle passed the residence, Mr. Messer pointed his shotgun at Deputy Trail's patrol car. (Trail Decl., ¶ 8). Trail accelerated past the house and positioned his patrol car north of the residence, while the Indiana State Troopers positioned their vehicles south of the Messer residence, and began surrounding the house. Correll testified that upon arrival he leveled his shotgun at Mr. Messer and yelled for Mr. Messer to put the weapon down, but Mr. Messer just walked back toward his house. (Correll Statement, p. 3). Krueger also told Mr. Messer over a public address ("PA") system to stop and put down the gun. (Krueger Statement, p. 5). Eventually, Deputy Bolington used Correll's PA to attempt to negotiate with Mr. Messer, while Correll assisted Krueger near the detached garage close enough to clearly hear Mr. Messer make threats at the officers 'to take off their badge[s] and come up and he'd kill them.' (Correll Statement, p. 8). These negotiations

---

[1]      Later identified as the decedent, Mr. Messer.

4

proceeded for over an hour as the moon shone brightly casting shadows, and Mr. Messer carried his shotgun at his side while walking to and around a truck parked just outside and in and out of his house. McCall rated the visibility as moderate, due to Mr. Messer's porch light being on, and the officers' use of spotlights and take down lights which were shining towards the residence. (McCall Statement, p. 8). Sergeant Tim Isenberg ("Isenberg") also arrived at the scene, and noted that their lights were illuminating the area towards the house very well and "you could see pretty much everything he was doing." (Isenberg Statement, p. 10). Isenberg stated that Mr. Messer came to his door once or twice and leaned his shotgun against the door; when he came off of the porch, he carried his shotgun with him. (Isenberg Statement, p. 8-9).

During the negotiations, Mr. Messer demanded a case of beer and an eightball of cocaine. (Correll Statement, p. 9; Krueger Statement, p. 8-9). Trail testified that Mr. Messer made several statements including 'take off your badge and come out' and 'I'm going to finish my beer and your going to have to shoot me.' *Id.* at ¶ 16. Correll testified that Mr. Messer was making comments about his wife and stating that he 'wasn't coming out alive and we [the officers] were gonna have to kill him.' (Correll Statement, p. 4, 11). McCall testified that Mr. Messer told the officers to take their badges off and come beat him up. (McCall Statement, p. 13). McCall also noted that at one time it looked as if Mr. Messer was not only carrying his shotgun, but he also had a red gas can. (McCall Statement, p. 12).

Detective Rick Bonesteele arrived at the scene, identified himself, and also attempted negotiation with Mr. Messer. Mr. Messer began ranting as to whether his wife was sleeping with Bonesteele. Immediately before the standoff concluded, the negotiator told Mr. Messer to drop his weapon, but instead Mr. Messer said, "fuck it", and walked toward the officers on the southern side

of the property and pointed his weapon in that direction. (Trail Decl., ¶ 17). Correll and Krueger also watched, and testified that they saw Mr. Messer yelling for the officers to stop hiding behind their spotlights, and then walk in a southwest direction, level the weapon, then hesitate, and then walk "briskly" or with a "hurried walk" and lift the gun back up— which is when Correll and Krueger thought they saw a muzzle flash from Mr. Messer's weapon, and each fired. (Correll Statement, p. 12, 13; Krueger Statement, p. 10). McCall testified that he saw Mr. Messer raise the gun a third time and fire, which is when McCall returned fire. (McCall Statement, p. 14). Isenberg observed Mr. Messer approach further than before as officers yelled for him to put the weapon down, but instead Mr. Messer brought the shotgun from a "low ready" position, to a "high ready" position —taking aim and pointing in Isenberg's direction when he heard shots fire. (Isenberg Statement, p. 10-12). Mr. Messer fell to the ground, and the officers approached.

<u>Testimony of Chief Deputy Terry Risner and Sheriff James DeVoss</u>

This same evening, Jasper County Sheriff's Department Chief Deputy, Terry Risner ("Chief Risner"), heard radio traffic that William Messer was causing a disturbance in the area where he resides and had told a clerk at the Family Express that he had a rifle and wanted to confront the police. (Risner Statement, p. 2). Chief Risner was not on duty at the time but responded to the radio post because he was familiar with Mr. Messer[2]. Once in the area, neighbors of the Messer residence reported a vehicle matching Mr. Messer's truck being driven recklessly and running into a ditch just

---

[2]     In early August 2005, Mr. and Ms. Messer separated as a result of an argument between the two, prompting their son Jacob to call 911. (Messer Depo., p. 22-24, 27-28). Members of the Jasper County Sheriff's Department responded to that call. *Id.* at 29-30. Also, a few days before the incident, Ms. Messer filed for a temporary restraining order against her husband Mr. Messer. *Id.* at 35. Members of the Jasper County Sheriff's Department attempted to serve the order on Mr. Messer earlier in the day on August 17, 2005, but were not successful. (Risner Depo., p. 19; Risner Statement, p. 2). These facts are the subject of Plaintiff's Motion to Strike discussed *infra.*

south of the Messer residence. Chief Risner radioed back to dispatch (so that responding officers would hear) and instructed the officers to use due caution when having contact with Mr. Messer, because the sheriffs attempted to serve a protective order on Mr. Messer at that same residence, earlier that day. Chief Risner advised that Mr. Messer had a 'propensity for escalation in his verbalization and a violent attitude' (Risner Depo., p. 19). It is unclear whether Troopers Meyrose and Larsh specifically knew of the protective order or of Mr. Messer's tendencies.

Upon arriving at the scene, Chief Risner was aware that Mr. Messer had pointed a shotgun at Deputy Trail and that Trail accelerated to get out of the kill zone area, while Mr. Messer returned to his house where there was a truck sitting in the front yard. Chief Risner wanted Mr. Messer arrested for having pointed a gun at his officer, and wanted to keep Mr. Messer from getting back into the public. (Risner Statement, p. 7). Chief Risner joined approximately four or five squad cars stopped on the south side of the residence, while Trail remained on the north side. Chief Risner recognized Trooper Correll's voice over the PA system and he heard Mr. Messer using an extreme amount of profanity and telling the boys to take their badges off and come up. At one point, Chief Risner observed Mr. Messer with a pump action long barrel shot gun, and "heard him [Mr. Messer] rack the action as if to load the weapon which, you know, is a very distinctive sound and it carries very well. I knew he racked the action." (Risner Statement, p. 5).

Eventually, Sheriff James DeVoss, Jr. ("DeVoss") arrived at the scene, where he saw red and blue lights from the police cars, and spotlights pointing toward Mr. Messer's residence. (DeVoss Depo., p. 32). DeVoss followed Chief Risner's instructions to call the local prosecutor regarding possible charges for Mr. Messer's committing criminal recklessness with a weapon or felony intimidation. (DeVoss Depo., p. 111). DeVoss observed Mr. Messer on and just off of the porch

7

while holding a long gun. But DeVoss was too far away to see what Mr. Messer was doing in the house, and he *never* saw Mr. Messer load the gun, unload the gun, or cock the gun. *Id.* at 70, 72. However, DeVoss could hear Mr. Messer yelling 'shoot me, shoot me.' *Id.* at 42.

Just after leaving the house, DeVoss watched Mr. Messer walk off of the porch with "determination," heading in a southwest direction and going further than he ever did before. (DeVoss Depo., p. 64). DeVoss testified that Mr. Messer "charged off the porch towards us [the officers] and he [Mr. Messer] lifted the shotgun and put it to his shoulder and pointed it in our direction." (DeVoss Depo., p. 57, 61-62, 64-66, 104). DeVoss ducked because he thought Mr. Messer was going to shoot and because he felt Mr. Messer presented a threat to him and the officers in his vicinity. *Id.* at 57, 61-62, 68, 85-86, 114. He did not know if Mr. Messer's gun was loaded or unloaded. *Id.* at 80. That's when the troopers fired. *Id.* at 89.

After the incident, someone told DeVoss that Mr. Messer's shotgun was not loaded. *Id.* at 97. DeVoss testified that he did not tell Ms. Messer that he, or anyone else, knew that the gun was not loaded before Mr. Messer was shot; nor, did he tell Ms. Messer that he, or anybody else, knew what Mr. Messer was doing inside the house just before he was shot. *Id.* at 100.

Chief Risner had an obstructed view when Mr. Messer left the porch the last time, but he heard Mr. Messer's voice getting louder and heard officers yelling for Mr. Messer to drop the gun several times, then he heard gun shots. (Risner Statement, p. 9; DeVoss Depo., p. 67). After Mr. Messer was shot, Chief Risner moved forward and saw Mr. Messer on the ground, so he immediately approached to get the weapon away from his feet and hands, because he did not want Mr. Messer to grab the weapon. (Risner Depo., p. 63; Risner Statement, p. 9-10). Chief Risner believed that the weapon was loaded and "absolutely" believed that Mr. Messer had closed the distance to a point

where he was close enough to put the officers in jeopardy of serious bodily injury if Mr. Messer had discharged his shotgun. *Id.* Ultimately, Chief Risner acknowledged that they were going to deploy less lethal force, such as beanbag rounds, but the situation never presented itself because Mr. Messer had his gun. (Risner Statement, p. 7).

### Testimony of Trooper Kevin Meyrose

On August 17, 2005, Indiana State Police Trooper Kevin Meyrose ("Meyrose"), a trooper since June of 1995 trained in the use of deadly force, was assigned to the Lowell post and began his shift at 7:00 p.m. (Meyrose Depo., p. 11-14). At approximately 8:49 p.m., Meyrose received an assignment from the post dispatcher about a call regarding a dark colored pickup truck. Meyrose was informed that the suspect in the vehicle was threatening to burn down his house, was armed with an AK 47 and a shotgun, and that he wanted to "know what the police had." *Id.* He was also told that Trooper Correll found the vehicle crashed in a ditch on 100 West, between 400 North and 600 North, and that the suspect was first barricaded in the vehicle. *Id.* at 14-18. Meyrose then received the address of the residence where the suspect was located and arrived at the scene.

Meyrose first spoke with Sheriff Aaron Agent and then positioned himself on the north side of the property along with Trail. Trail instructed Meyrose that Mr. Messer had pointed his gun at their patrol car when Trail passed the Messer residence, and that Mr. Messer was threatening the deputies and officers already at the scene, and was carrying a shotgun while walking in and out of the house and yelling about his wife. (Meyrose Depo., p. 18-19). Meyrose then personally observed Mr. Messer holding a shotgun, and, at separate times, holding a beer bottle then a gas can. *Id.* at 29. Meyrose recalled conversing with Trail that if Mr. Messer made an aggressive movement toward them, they were going to have to shoot and stop his actions because they had very little cover and

9

were so close to the suspect. *Id.* at 26. Meyrose could hear Mr. Messer when he went inside the house, ransacking the house and breaking things. *Id.* at 34-35.

Meyrose witnessed Correll and another deputy advising Mr. Messer over the PA system to drop his weapon and come out and talk. (Meyrose Depo., p. 31). Meyrose also witnessed the negotiator, Detective Rick Bonesteele, tell Mr. Messer to pick up the phone and stop threatening them. *Id.* at 31-32. The officers negotiated with Mr. Messer for almost two hours, during which time Mr. Messer continued to appear intoxicated and responded with derogatory comments regarding his wife, and said things like 'boys, ya'll aren't leaving tonight till somebody kills me. . .either you kill me or I'm gonna kill you.' (Meyrose Depo., p. 32; Meyrose Statement, p. 7). Mr. Messer eventually discovered their position in the north tree line because Trail sneezed, and Mr. Messer looked at them and said something like, "boys, I know you're in there. . . don't make me have to kill you." *Id.* When Mr. Messer left the porch, Meyrose heard him say something like 'I'm tired of this, lets get this over with.' *Id.*

At the critically defining point in the evening, Meyrose watched as Mr. Messer stepped off the porch with his gun in a "low ready" position— holding the gun "down around his waist, right hand on the part that you hold when your finger goes to the trigger." (Meyrose Depo., p. 33). Meyrose testified that Mr. Messer had "his left hand slightly ahead of what we call the 'action' or the 'stack'." *Id.* Meyrose continued to watch as Mr. Messer began walking "deliberate[ly] . . .like he had a destination in mind" towards Detective Bonesteele, in a southwesterly direction. (Meyrose Depo., p. 34). From about 60 yards away, Meyrose saw Mr. Messer slow as he shouldered the gun, put the stock of the shotgun into his shoulder, and raised it almost completely level (if not completely) at the officers. After Mr. Messer lifted and aimed the gun, Meyrose discharged his

10

weapon striking Mr. Messer in the hip and buttock. Meyrose saw his muzzle flash and saw Mr. Messer's muzzle flash, but he did not remember *hearing* any shots before he fired his weapon. (Meyrose Statement, p. 14; Meyrose Depo., p. 39) (emphasis added). Meyrose estimated that Mr. Messer was approximately 15 to 20 yards away from the other officers located in the southwest corner, and Meyrose believed that those officers were in striking distance and in threat of imminent bodily harm or death by Mr. Messer's actions.

<u>Testimony of Trooper Chad Larsh</u>

Also involved in this incident was Indiana State Police Trooper Chad Larsh ("Larsh").[3] On the evening of August 17, 2005, Larsh was assigned to the Breman post and began his shift at 5:45 a.m. on August 16. (Larsh Depo., p. 36). Larsh, while heading home at the end of his shift, heard communication from the Lowell post that units were out with an individual [Mr. Messer] barricaded in his home and that a negotiator was requested. While in route, Larsh also heard radio traffic from officers at the scene reporting that when the suspect came outside, he did so with a gun to his head, carrying a gas tank or gas can, and walking in and out of the residence. *Id.* at 54-55, 63-64. As a member of the Emergency Response Team ("ERT") and a sniper observer, Larsh called the Lowell post to inquire into the situation and was given the location of the Messer residence with the understanding that he would arrive at the scene, unless he received instruction not to approach. *Id.* at 60-65.

Larsh arrived at the scene and parked his vehicle on the south side of the residence behind seven or eight other police cars. (Larsh Depo., p. 66-67). Larsh then grabbed a tactical vest and a

---

3 Larsh is an experienced officer who graduated from the police academy in June of 1995. Since graduation his training has included participation in a sniper observer training program, and a Emergency Response Team wherein officers are trained in special weapons and tactics and in dealing with coordinated police work for high risk situations such as hostage or barricade situations. (Larsh Depo., p. 5-13).

rifle, and contacted ERT team leader, Sergeant Tim Isenberg. *Id.* Shortly thereafter, Chief Deputy Risner asked Larsh whether or not he was a sniper. Larsh confirmed that he was. *Id.* at 68. After Chief Deputy Risner and Sergeant Isenberg conferred, Larsh was instructed by Isenberg to obtain his sniper rifle which had a scope attached to it, allowing him to get a better view of Mr. Messer. *Id.* at 68, 74-75, 81. Isenberg instructed Larsh that no shot would be authorized unless the suspect moved to a position that threatened the officers by pointing in their direction— Isenberg believed Mr. Messer's shotgun was loaded. (Isenberg Statement, p. 14, 17-18). Before grabbing his sniper, Larsh observed Mr. Messer walking in and out of the house, yelling from the porch, and drinking from his beer bottle, while officers negotiated with him over a loud speaker. (Larsh Depo, p. 77-78).

While the negotiation continued, Larsh positioned himself in a place where he could call out the details of what was occurring. Larsh observed Mr. Messer through his scope from about 81 yards away[4] yelling from his porch without going further, with a beer bottle in his right hand and a shotgun in his left hand over his shoulder, or swinging it around, and exhibiting obvious signs of intoxication (including going through stages of calmness and then becoming irate and walking unsteadily). (Larsh Depo., p. 78-79). While Mr. Messer was walking in and out of his house he was yelling things like 'why don't you just go ahead and shoot me,' but Larsh called out to the other officers that there was no threat because Mr. Messer did not have his finger on the trigger. *Id.*

Suddenly, Larsh saw Mr. Messer walk off of the front porch with "[A] change of attitude. Like he [Mr. Messer] was on a mission." (Larsh Depo., p. 85-90). Larsh observed Mr. Messer walking in his direction (in a southwesterly direction also toward the officers just to his right) with

---

4       After the incident, Larsh used a digital range finder to determine how far away he was from the front porch and from where Mr. Messer eventually fell. (Larsh Depo., p. 81).

a "very brisk walk" and carrying his shotgun in a low, ready position with his right hand in the area of the trigger mechanism and his left near the barrel portion where you cock the gun. *Id.* Larsh recalls the negotiator talking to Mr. Messer, but Mr. Messer continued to walk toward Larsh and stated something like "Let's get one thing straight, one of you [guys are going to, is going to, *or* will] shoot me tonight." (Larsh Depo. 97-87; Larsh Statement, p. 11). While Mr. Messer was making this statement, Larsh testified that Mr. Messer "never stopped walking, and that's when he took the gun from the low ready position to– he took the butt of the gun and he pulled that into his shoulder. And at that point he starts raising the weapon in the direction of myself and the multiple other officers to the right-hand side." (Larsh Depo., p. 97-98). Seeing Mr. Messer's full figure through his scope as he continued to adjust it for the lighting and changing distance, Larsh watched Mr. Messer raise his gun— pointing it at Larsh and the officers just to his right. As Mr. Messer approached Larsh and raised his gun, but immediately before Mr. Messer got his gun "completely leveled," Larsh discharged his weapon, striking Mr. Messer with a fatal shot. (Larsh Depo., p. 98-101).

Larsh testified that had Mr. Messer fired his shotgun, he was at a distance that the shot could have been fatal to himself or the other officers[5], and that he did not have any time to personally warn Mr. Messer that he was going to shoot him if Mr Messer raised his shotgun. (Larsh Depo., p. 130-

---

[5]     Larsh's recorded statement taken on August 18, 2005, the day following the incident, indicates that Mr. Messer was approximately 49 yards away from Larsh, yet his deposition testimony, taken over a year later on December 13, 2006, indicates that Mr. Messer was only about 5 yards away. (Larsh Depo., p. 84, 100; Larsh Statement, p. 17, 24). Plaintiff's counsel never contends that this inconsistency raises a question of material fact. More importantly in this Court's view, Plaintiff never offers any evidence, expert testimony or otherwise, suggesting that Mr. Messer was not within striking distance of Larsh or the officers near him. Instead, the record evidence *only* supports the conclusion that the officers reasonably believed that Mr. Messer approached close enough, even assuming it was about 49 yards away, to strike Officer Larsh and nearby officers, had Mr. Messer fired any shots from his shotgun. Further, Larsh was near McCall, or behind and left of McCall, and McCall estimated that he was about 30 to 40 yards away from Mr. Messer when McCall shot at him. (McCall Statement, p. 15). Thus, even at a distance of 49 yards, Mr. Messer charged the officers for at least 30 yards and was within striking distance.

33). Larsh testified that when Mr. Messer raised his shotgun, he perceived the threat to himself and the other officers to be imminent, and likely to result in either bodily injury or death. *Id.* Larsh never thought that Mr. Messer had time to fire a shot first; however, Larsh testified that he absolutely had no choice but to shoot at the time. (Larsh Statement, p. 21-22).

Result

The standoff lasted approximately two hours, ending when Mr. Messer raised his gun and was shot a total of five times. (Plf's Exb. E/Defs' Exb. E, p. 3). The autopsy report revealed that Mr. Messer was shot once in the left shoulder/base of the neck, twice in the chest, once in the right buttock and once in the right hip. *Id.* at 4-5. He tested positive for cocaine and alcohol. (Defs' Exb. E, p. 18-19).

It is undisputed that no Jasper County Deputy fired. It is further undisputed that five Indiana State Police officers did fire, including Officers Meyrose, Larsh, McCall, Krueger, and Correll. All of them, except Officer Larsh, believed that Mr. Messer fired his weapon. The facts are clear that Officer Larsh fired the deadly shot. And, the record supports the only inference that all of the officers who fired, believed that Mr. Messer leveled the gun, aimed at the officers, and was close enough to strike the officers located in the southwestern direction.

While not determinative of this Court's decision on summary judgment, Defendants' expert, Darrell L. Ross, Ph.D., an expert in the use of force, reviewed the Indiana State Police investigatory file and concluded that the Indiana State Police officers did not create the need to use lethal force, but that Mr. Messer's active and aggressive resistance did so. (Defs' Exb. I). He also concluded that despite numerous commands to stand down, the officers reasonably formed the perception that their lives and the other officers were in immediate danger when Mr. Messer continued to advance toward

them and pointed the shotgun at them. *Id.*

## IV. ANALYSIS

A.    <u>Motions to Strike</u>

This Court has before it Motions to Strike filed by both the Plaintiff and the Defendants. Before the merits of Defendants' Motion for Summary Judgment can be addressed, it is necessary to rule on these motions.

Plaintiff seeks to strike the following materials from the summary judgment record: (1) Defendants' Exhibit J – Petition for Dissolution of Marriage; (2) testimony of Ms. Messer that she sought separations from Mr. Messer in the last year; (3) documents whereby Ms. Messer requested a Temporary Restraining Order against Mr. Messer; (4) testimony of Ms. Messer regarding her filing for a Temporary Restraining Order against Mr. Messer; (5) testimony of Chief Risner that the Jasper County Sheriff's Department sought to serve a protective order on Mr. Messer earlier in the day on August 17, 2005; and (6) testimony of Ms. Messer that in early August 2005, she separated from Mr. Messer as a result of an argument which prompted the Messer's son to telephone 911, and the Jasper County officers responded to that call.

Plaintiff asserts that this evidence should be stricken pursuant to FED. R. CIV. P. 12(f), which states that "the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Plaintiff believes that because this information was not made known to Troopers Meyrose or Larsh, the evidence is irrelevant. Yet, Defendants argue that the information is material, and that its probative value outweighs any harm because Chief Risner warned the officers that Mr. Messer had the propensity for escalation, that they sought to serve a protective order earlier that day, and that many members of the Sheriff's Department were familiar

15

with Mr. Messer and past disturbances— facts necessary to determine whether the officers' actions were objectively reasonable in light of the circumstances confronting them under *Graham v. Connor*, 490 U.S. 386 (1989). Defendants also state that the sheriffs responded to the incident in a manner based on their familiarity with Mr. Messer, and that their actions bore directly upon the actions of the ISP officers, even if Troopers Larsh and Meyrose did not have knowledge of Mr. Messer's past history.

In reviewing statements under FED. R. CIV. P. 12(f), allegations may be stricken as scandalous if the matter bears no possible relation to the controversy or may cause the objecting party prejudice. *Talbot v. Robert Matthews Distributing Co.,* 961 F.2d 654, 664-665 (7th Cir. 1992). The Court strikes form the record as irrelevant the information contained in paragraph (1), regarding the Petition for Divorce that was filed. The Court notes that the comments made by Mr. Messer (during the stand-off) regarding his wife and their divorce/relationship are not stricken because these facts are necessary to conduct a full analysis of the circumstances that the officers faced during the stand-off.

Unlike the Petition for Divorce, the information contained in paragraphs (2) through (6) is relevant to show that the Jasper County Sheriffs were familiar with Mr. Messer, which must be considered as part of the officers' knowledge when determining the reasonableness of their conduct in responding to Mr. Messer's behavior on August 17, 2005. Specifically Chief Risner, who ultimately directed Officer Larsh to retrieve his sniper, had knowledge from previous experiences with Mr. Messer that he was 'aggressive in nature, had a propensity for escalation in his verbalization, and had a violent attitude.' It is undisputed that Chief Risner communicated over the radio broadcast for responding officers to use due caution in dealing with Mr. Messer. This

16

information is pertinent to evaluating the officers' actions in responding, and its probative value outweighs any harm that the Plaintiff may be prejudiced. Notably, the Court will assume for purposes of summary judgment, that Troopers Meyrose and Larsh were *not* individually aware of the Messer's prior separations, the protective order, or for that matter, the information contained in paragraphs (2) though (6). With these limitations, Plaintiff's Motion to Strike (Doc. No. 47) is **GRANTED IN PART AND DENIED IN PART.**

In Defendants' Motion to Strike (Doc. No. 50), Defendants seek to strike the deposition testimony provided by Michelle Messer wherein she states that a few weeks after the August 17 incident, DeVoss approached her and her son at a gas station and allegedly stated: "at some point we knew the gun wasn't loaded . . .[because] he was pumping the gun . . .[and] no shells [were] flying out." (Messer Depo., p. 61-64). Ms. Messer confirmed that DeVoss never said *who* knew that the gun was unloaded, or *when* it was discovered that the gun was unloaded, but that it was some time while Mr. Messer was standing on the porch pumping the gun. (Messer Depo., p. 61-64, 76). Ms. Messer further testified that DeVoss told her: "after [Mr. Messer pumped the gun], then Wilmer went in the house . . .[and] somebody thought they heard him in our bedroom messing with the gun so he could have loaded it then." *Id.* at 64. Ms. Messer admitted that it *was possible that Mr. Messer could have loaded the gun* when he went back into the house thereafter. *Id.* at 65 (emphasis added). Ms. Messer is not aware of any evidence, aside from this statement, that the officers thought that the gun was unloaded, nor does she know if any of the shooting officers actually thought that the gun was unloaded. (Messer Depo., p. 76-77).

Defendants object to the above-referenced testimony as inadmissible hearsay evidence under FED. RULE OF EVID. 801 and 802, because it is an out of court statement allegedly made by DeVoss,

17

and is offered for the truth of the matter asserted. Defendants further argue that DeVoss's statement cannot be used against the Indiana State Police to infer that the Indiana State Police officers knew the gun was not loaded.

Plaintiff argues that the statement does not fit within the definition of hearsay because under FED. RULE OF EVID. 807, otherwise known as the residual hearsay exception, the statement should be considered where the trustworthiness of the statement is confirmed. Plaintiff contends that the statement is trustworthy because it was made just weeks after Mr. Messer's death and *can* be corroborated by Michelle Messer's son, Jacob. Further, the Plaintiff argues that the statement goes to a material fact, is more probative than any other evidence which the Plaintiff can procure because Mr. Messer is deceased, and serves the interests of justice, since it was made by a Jasper County Sheriff, once a party opponent. *See* FED. RULE OF EVID. 801(d)(2)(A).

In deciding when a hearsay statement fits the residual hearsay exception, trial courts have a considerable measure of discretion. *United States v. Dumeisi,* 424 F.3d 566, 574 (7th Cir. 2005) (citing *U.S. v. Sinclair*, 74 F.3d 753, 758 (7th Cir. 1996) (internal quotation omitted)). However, the Seventh Circuit has directed courts to narrowly construe the residual exception to the hearsay rule. *See Keri v. Board of Trustees of Purdue University*, 458 F.3d 620, 631 (7th Cir. 2006); *Akrabawi v. Carnes Co.*, 152 F.3d 688, 697 (7th Cir. 1998). Five elements must be satisfied before hearsay is admitted in evidence: "(1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice." *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999). "Critical to the admission of a hearsay statement under 803(24) [now 807] is a finding by the district court that the statement is trustworthy." *Keri*, 458 F.3d at 631. Generally, out of court statements are inadmissible because they are presumed to be unreliable." *Hall*, 165 F.3d

18

at 1110; *United States v. Hooks*, 848 F.2d 785, 796 (7th Cir. 1988). Therefore, a party "wishing to introduce hearsay evidence must rebut the presumption of unreliability by appropriate proof of 'trustworthiness.'" *Hall*, 165 F.3d at 1110.

In this case, there is no doubt that Ms. Messer did not witness the incident. She now seeks to use an out of court statement allegedly made by DeVoss, when DeVoss testified that he was too far away to see what Mr. Messer was doing in the house, and when he testified that he *never* saw Mr. Messer load the gun, unload the gun, or cock the gun. (DeVoss Depo., p. 70, 72.). Therefore, someone *unknown*, told DeVoss, who then told Ms. Messer, that *at some point in time* someone *unknown* knew the gun wasn't loaded. The information ranks of inadmissable hearsay to say the least, and hardly comports with the guarantees of trustworthiness.

However, in the interest of justice, the Court considers the alleged out of court statement made by DeVoss to Ms. Messer as part of the summary judgment record, and will deny Defendants' Motion to Strike. This is so, because Ms. Messer's conversation with DeVoss does not, and cannot, create a genuine issue of material fact. Assuming that the *Defendants* knew that the gun was unloaded at a point in time when Mr. Messer cocked his gun, it is undisputed that Mr. Messer then went back into the house— even according to Ms. Messer. Ms. Messer admitted that *it was possible* that Mr. Messer could have loaded the gun when he went back into the house. It is also undisputed that no one could see what Mr. Messer was doing inside the house, but the officers could only hear him making noise. Because there is no evidence to infer that any of the officers, let alone the named Defendants, knew whether Mr. Messer's gun was loaded or unloaded once he entered his house and later exited, no reasonable jury could find that the officers knew that the gun was not loaded when he charged ahead toward the officers and took aim.

19

Although this motion raises some interesting and perhaps difficult technical evidentiary questions, this Court has resolved to let the record stand, and **DENIES** Defendants' Motion to Strike (Doc. No. 50).

## B. Motion for Summary Judgment

### 1. § 1983 and Constitutional Claims

The Plaintiff claims that Defendants Larsh and Meyrose, while acting under color of law, deprived the decedent of his rights guaranteed by the Eighth Amendment and the Fourteenth Amendment. However, the Eighth Amendment applies to persons who have been convicted. *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998); *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997). Mr. Messer was not in the custody of the Indiana State Police when the incident occurred, and as such, no Eighth Amendment claim is applicable here. Also, the Fourth Amendment objective reasonableness standard, not the Fourteenth Amendment's substantive due process standard, provides the proper analysis in excessive force in arrest claims. *Lester v. City of Chicago*, 830 F.2d 706, 710-11 (7th Cir. 1987). Therefore, the Court turns to the Fourth Amendment analysis.

The Plaintiff's § 1983 claim is based on an alleged violation of Mr. Messer's Fourth Amendment right to be free from unreasonable seizures.[6] To prevail under 42 U.S.C. § 1983, a

---

6    Plaintiff's counsel did not pursue other Fourth Amendment claims other than excessive force or unlawful use of deadly force throughout summary judgment. To the extent that Plaintiff alleges false arrest or false imprisonment, those claims are without merit. Plaintiff fails to contest the facts in the record that support a finding of probable cause for his arrest, and does not allege that those facts were misrepresented or concealed. The summary judgment record reveals that Mr. Messer aimed his gun at DeVoss's patrol car upon his arriving at the Messer residence to investigate the calls made to dispatch concerning an intoxicated male at the Family Express threatening to burn his house down, armed with a weapon, and driving a truck registered to Michelle Messer. DeVoss was then advised about a dispatch call regarding the truck being driven recklessly and ditched near the Messer residence. For the purposes of summary judgment, it is undisputed that the officers had

20

plaintiff must establish that: (1) he had a constitutionally protected right, (2) he was deprived of that right in violation of the Constitution, (3) the defendant(s) intentionally caused that deprivation and (4) the defendant(s) acted under color of state law. *See Bublitz v. Cottey*, 327 F.3d 485, 488 (7th Cir. 2003); *Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir. 1990).

In this case, there is no dispute that the Defendant officers were acting under color of state law. Furthermore, this is not a case where the officers claim to have used deadly force to prevent an escape. Instead, this is a self-defense case where the officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer, and therefore the officer may use deadly force." *Plakas v. Drinski*, 19 F.3d 1143, 1146 (7th Cir. 1994) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985); *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Thus, the question is whether the Defendants used excessive force in the course of arresting or seizing Mr. Messer, which must be analyzed under the Fourth Amendment and its "reasonableness standard." *Graham*, 490 U.S. at 395.

It is true that before undertaking an analysis of the reasonableness of Defendants' actions, the Court must determine whether, and when, a seizure occurred. *See Escobedo v. City of Fort Wayne*, 2008 WL 1971405 (N.D. Ind. May 5, 2008). Yet, Plaintiff does not contest the point. At any rate, this Court finds that the two hour stand-off with Mr. Messer surrounded by officers at his home, is similar to the situation the officers faced in *Escobedo* where the suspect barricaded himself in his

---

probable cause to believe that criminal activity was afoot, and had probable cause to arrest Mr. Messer when the facts and circumstances warranted a prudent person to believe that Mr. Messer had committed or was committing a crime. Here, Mr. Messer, after allegedly driving erratically and in an intoxicated state, no doubt, leveled a firearm at an officer, resisted law enforcement, and threatened another person with bodily harm and made them fear for their safety. Any claim of false arrest or false imprisonment asserted under § 1983 is barred on the basis of these undisputed facts. *See Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989).

apartment. *See Escobedo v. City of Fort Wayne*, 2008 WL 1971405 *18-23 (N.D. Ind. May 5, 2008).

As such, this Court adopts the Honorable Judge Theresa L. Springmann's seizure analysis in finding

that here too, a reasonable person in Mr. Messer's circumstances would have observed that there was

nothing else he could do, but surrender as ordered, for the police to end the show of authority and

leave. *Id.* Therefore, Mr. Messer was seized at the point where the police officers surrounded his

home with weapons drawn and began negotiations for Mr. Messer's surrender. *See Id.* (citing

*Brendlin v. California,* 127 S.Ct. 2400 (2007); *United States v. Mendenhall*, 446 U.S. 544, 554

(1980); *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008); *United States v. Adeyeye,* 359 F.3d

457, 462 (7th Cir. 2004); *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997); *Kernats v.*

*O'Sullivan*, 35 F.3d 1171, 1178 (7th Cir. 1994)).

Having determined that Defendants seized Mr. Messer, the Court now turns to the manner

in which he was seized, to determine whether the application of force was reasonable.

A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth

Amendment, and therefore it must be reasonable. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985);

*DeLuna v. City of Rockford, Ill.,* 447 F.3d 1008, 1010 (7th Cir. 2006). In *Tennessee v. Garner*, the

Supreme Court outlined the principles for evaluating whether the use of deadly force is reasonable

under the Fourth Amendment:

> Where the officer has probable cause to believe that the suspect poses
> a threat of serious physical harm, either to the officer or to others, it
> is not constitutionally unreasonable to prevent escape by using deadly
> force. Thus, if the suspect threatens the officer with a weapon or
> there is a probable cause to believe that he has committed a crime
> involving the infliction or threatened infliction of serious physical
> harm, deadly force may be used if necessary to prevent escape, and if
> where feasible, some warning has been given.

*Garner*, 471 U.S. 11-12. The fact-specific nature of whether an officer used excessive force depends on the totality of the circumstances surrounding the encounter. *Estate of Phillips v. City of Milwaukee*, 123 F.3d. 586, 592 (7th Cir. 1997). The Seventh Circuit has also held that, if the suspect threatens the officer with a weapon, the risk of serious physical harm to the officer or others has been established. *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003) (citing *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) (*en banc*); *Ford v. Childers*, 855 F.2d 1271 (7th Cir. 1988) (*en banc*)).

Further, whether the intentional use of deadly force by a police officer is permissible under the Fourth Amendment requires an objective reasonableness inquiry. *See Graham v. Connor*, 490 U.S. 386, 399 (1989). The officer's subjective belief or motivations are irrelevant. *See id.* at 397 ("[E]vil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will...good intentions make an objectively unreasonable use of force constitutional."). The "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vison of hindsight." *Id.* at 396; *see Bell*, 321 F.3d at 639; *Estate of Phillips*, 123 F.3d at 592. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397; *see Estate of Phillips*, 123 F.3d at 592. Moreover, the reasonableness calculation "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-7. Consequently, "when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Muhammed v. City of Chicago*, 316 F.3d

23

680, 683 (7th Cir. 2002) (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (*en banc*) (emphasis omitted)).

When Troopers Meyrose and Larsh arrived at the Messer residence, they personally observed Mr. Messer holding a shotgun, drinking beer, and exhibiting obvious signs of intoxication. Faced with this situation, other officers at the scene attempted to negotiate with Mr. Messer. It is clear that Mr. Messer knew he was dealing with the police, as he yelled at them to take off their "badges." Troopers Meyrose and Larsh overheard the negotiators talking to Mr. Messer, while Mr. Messer refused to put his gun down and talk, but instead continued to threaten the officers. The officers attempted non-fatal tactics, as the negotiation continued for almost two hours.

Both Troopers Meyrose and Larsh, also personally witnessed Mr. Messer walking in and out of the house, with no idea what Mr. Messer was doing while in the house. Suddenly, Meyrose and Larsh watched, as Mr. Messer walked "deliberately" as if he was "on a mission," toward Trooper Larsh, and the other officers in his vicinity. It is undisputed that Mr. Messer walked further from the house than he had before, and that he closed-in almost 30 yards on the officers within seconds. No testimony contradicts the testimony given by Larsh and Meyrose, that Mr. Messer, within striking distance, raised his shot gun and aimed at the officers. Fearing for their safety and the safety of the officers in the path of Mr. Messer's aim, Larsh and Meyrose fired their weapons. This Court holds that the actions of the officers amount to an objectively reasonable response to the escalating situation they faced. *See Estate of Phillips*, 123 F.3d at 593 (citations omitted).

Ms. Messer has not set forth specific facts in the record to attack the credibility of the officers, *see Muhammed*, 316 F.3d at 683-84, except to say that it is fishy that only Larsh, and not the other shooting ISP officers, thought Mr. Messer had fired his weapon. Yet, belief that Mr.

24

Messer fired, only goes to strengthen the reasonableness of the response to fire back. Aside, the risk of serious physical harm was established when Mr. Messer undisputedly charged toward the officers, failed to heed the warnings to stop, and pointed his gun at the officers. *See Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003) ("We have held that, if the suspect threatens the officer with a weapon, the risk of serious physical harm to the officer or others has been established"). Mr. Messer need not have actually shot his gun to make the Defendants' response reasonable. Further, and most importantly, there have been no facts set forth which show or suggest that Mr. Messer did not level his shotgun.[7]

Plaintiff also contends that Defendants had a duty to use alternative methods short of deadly force to resolve the situation before them, such as beanbag rounds. Chief Risner testified that the Sheriff's Department was ready to utilize less-than-lethal force, but the situation never presented itself— there is no dispute that Mr. Messer kept his gun with him whenever he walked off the porch, and always had it near him even on the porch. The officers continued negotiations during this time, not yet needing to resort to, and attempting not to resort to, deadly force against the volatile Mr. Messer.

After the shooting, Chief Risner also testified that Mr. Messer had closed the distance to a point where he was close enough to put the officers in jeopardy of serious bodily injury if Mr. Messer had discharged his shotgun— and, once Mr. Messer went down, fearing the gun was loaded, Chief Risner immediately approached and secured the weapon away from Mr. Messer. The Seventh Circuit support the assertion that, where deadly force is otherwise justified under the Constitution,

---

[7]    Asked during oral argument whether Plaintiff had any evidence to indicate that Mr. Messer did *not* level the gun, none was offered, except to say Plaintiff questioned the credibility of the officers.

there is no constitutional duty to use non-deadly alternatives first. *See Plakas v. Drinski*, 19 F.3d 1143, 1148 (7th Cir. 1994). The Fourth Amendment does not require the use of the least or even a less deadly alternative, so long as the use of deadly force is reasonable under *Garner v. Tennessee* and *Graham v. Connor*. *See Plakas*, 19 F.3d at 1149. The officers attempted to force Mr. Messer's surrender by use of non-lethal force, during an almost two hour negotiation. The negotiation failed. Troopers Meyrose and Larsh were justified in concluding that Mr. Messer could not be subdued at the precise moment when he lifted and aimed his shotgun, except through gunfire. As the Seventh Circuit has held:

> We do not return to the prior segments of the event and, in light of hindsight, reconsider whether the prior police decisions were correct. Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer.

*Plakas,* 19 F.3d at 1150. When the record is examined fully and in the necessary detail, this Plaintiff remains hard pressed to make an argument in her favor on the merits. Here, this Court finds that the undisputed facts can lead it to but one conclusion, that Troopers Meyrose and Larsh's use of deadly force was reasonable given Mr. Messer's act of aggression throughout the stand-off, and sudden charging ahead with determination and aiming his gun at the officers.

In making this determination, this Court has also given very close personal attention to *Tennessee v. Garner*, 471 U.S. 1 (1985), as well as to an overwhelming array of decisions in this circuit dealing with the concept that inheres in *Tennessee*.[8]

---

8    *See Chelios v. Heavener*, 520 F.3d 678, 689 (7th Cir. 2008) (reversing the grant of summary judgment in favor of defendant officer, police chief, and the municipality on the grounds that factual issues existed as to whether the claimant made physical contact with the officer, had committed a crime, or resisted arrest); *Henning v.*

*O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) (affirming the grant of summary judgment in favor of defendants for Fourth Amendment violation where defendant resisted a lawful arrest and believed he had his hand near the officers' loose gun, and while plaintiff asserted a different version of the facts, failed to offer affirmative evidence to corroborate those facts; and noting that Fourth Amendment rights are personal rights which may not be vicariously asserted) (citations omitted); *Sallenger v. Oakes*, 473 F.3d 731, 739+ (7th Cir. 2007) (affirming the denial of summary judgment on unreasonable force claims where defendant officers used closed fist blows and a flashlight on the defendant who was handcuffed, unarmed, did not commit a crime, and stopped moving at some point in time); *Acevedo v. Canterbury*, 457 F.3d 721, 724+ (7th Cir. 2006) (reversing district court's judgment as a matter of law in favor of officer after trial and finding that the officer's blow to the defendant's face causing him to fall down and black out may have constituted a seizure for purposes of excessive force); *DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1010 (7th Cir. 2006) (affirming the grant of summary judgment in favor of the officer who responded to a domestic disturbance dispatch, and once at the residence and prior to the shooting, the decedent's wife told the officer not to shoot because he had nothing in his hands, but at the time of the shooting, the officer was presented with a suspect who had a history of violence, and who was known to both carry and sell weapons, who may have possessed a weapon in the back of his waistband, and was acting in an irrational manner, appearing shirtless and disregarding repeated instructions to raise his hands and to stop but instead continued his approach towards the officer making statements that he "had something for" the officer and that the officer was going to have to kill him); *Abdullahi v. City of Madison*, 423 F.3d 763, 768+ (7th Cir. 2005) (reversing the grant of summary judgement in favor of the officers and city for excessive force claim noting that for summary judgment purposes a court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence); *Morfin v. City of East Chicago*, 349 F.3d 989, 1004 (7th Cir. 2003) (reversing the district court's grant of summary judgment in favor of arresting officers for an excessive force claim because disputed facts existed where plaintiff stated that he did not resist arrest but was peaceful and cooperative; noting that the existence of probable cause to arrest precludes a § 1983 claim for false arrest/imprisonment); *Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003) (affirming grant of summary judgment on the grounds that the officer's use of deadly force to effect an arrest was reasonable where it was undisputed that there were persons in the immediate vicinity in imminent danger of death or serious bodily injury as the fleeing felon attempted escape in an automobile; noting that the timing of the first and fatal shots, not later shots, are critical to determining whether there is an immediate threat to the officer at the time deadly force is used); *McCoy v. Harrison*, 341 F.3d 600, 605 (7th Cir. 2003) (affirming the grant of summary judgment in concluding that there was no seizure of the plaintiff and thus no Fourth Amendment claim where there was no evidence to show the officer intended to or did acquire physical control over the plaintiff's person, nor was there a show of authority and restraint of the plaintiff's movements) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *Brower v. Inyo County*, 489 U.S. 593, 596 (1989)); *Bell v. Irwin*, 321 F.3d 637, 639+ (7th Cir. 2003) (affirming the grant of the officers' summary judgment motion for a claim of excessive force when the officers used beanbag rounds and injured the arrestee); *Muhammed v. City of Chicago*, 316 F.3d 680, 683+ (7th Cir. 2002) (affirming grant of summary judgment in favor of the officers noting that the robber's identity was irrelevant where the officers knew that a robbery had been committed and the decedent subsequently threatened the officers with a gun, and finding that the second round of shots fired was lawful where the plaintiff failed to identify any specific eyewitness testimony or other impeachment evidence that contradicted the officer's testimony that the decedent aimed his gun at the officer); *Pena v. Leombruni*, 200 F.3d 1031, 1033+ (7th Cir. 1999) (affirming directed verdict in favor of the sheriff and summary judgment upon a jury verdict for the other defendants in a § 1983 excessive force action because the fleeing, shop-lifting, concrete-wielding assailant posed a potentially lethal danger); *Deering v. Reich*, 183 F.3d 645, 650+ (7th Cir. 1999) (affirming jury verdict in favor of officer and noting that the totality of the circumstances include what the officers know about the suspect at the time and the events that occurred around the time of the shooting); *Mays v. City of East St. Louis, Ill.*, 123 F.3d 999, 1000+ (7th Cir. 1997) *abrogated by County of Sacramento v. Lewis*, 523 U.S. 833 (1998) (holding that the Fourth Amendment reasonableness standard did not apply to a § 1983 claim where the police pursuit did not constitute a seizure of the passenger); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592+ (7th Cir. 1997) (affirming grant of summary judgment concluding that neither the city nor the police officers' supervisor can be held liable on a failure to

As a basic and fundamental matter, it must be remembered that the standards required under 42 U.S.C. § 1983 require something more than mere negligence. *See Davidson v. Cannon*, 474 U.S. 344 (1986); *Daniels v. Williams*, 474 U.S. 327 (1986). After a good deal of judicial soul-searching, and with a well-known judicial bias in favor of trials by jury in civil cases, this Court has, with considerable anxiety, concluded that the record in this case compels the granting of summary judgment on the federal claims under Rule 56 to the remaining Defendants here.

Lastly, Defendants have asserted that they are entitled to qualified immunity. However, because this Court finds that Troopers Meyrose and Larsh did not violate any constitutional right on

---

train theory or on a municipal policy theory absent a finding that the individual police officers are liable on the underlying substantive claim) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)); *Frazell v. Flanigan*, 102 F.3d 877, 882 (7th Cir. 1996), *abrogated on other grounds by Saucier v. Katz,* 533 U.S. 195 (2001) (holding that an officer may be immune from damages even if the court has found him liable for objectively unreasonable conduct); *Plakas v. Drinski*, 19 F.3d 1143, 1146 (7th Cir. 1994) (affirming summary judgment in favor of officer and county for excessive force claim finding that the officer was faced with a man who had, minutes before, attacked another police officer with a dangerous weapon, had refused several entreaties to disarm, had told the officer that one of the two would die that night, and then had moved toward the officer while raising his weapon to strike; also noting that the award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify and the only person likely to contradict the officer is beyond reach, and therefore a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial); *Donovan v. City of Milwaukee*, 17 F.3d 944, 949+ (7th Cir. 1994) (affirming summary judgment in favor of the City as to plaintiff's *Monell* claim, and in favor of the officer entitled to qualified immunity in using a deadman roadblock); *Ellis v. Wynalda*, 999 F.2d 243, 245+ (7th Cir. 1993) (reversing the grant of summary judgment where it was factually disputed whether the fleeing suspect posed an immediate threat when the officer shot him in the back and where there was no particular reason to believe that the suspect was armed); *Carter v. Buscher*, 973 F.2d 1328, 1331+ (7th Cir. 1992) (affirming summary judgment in favor of defendant officers as there was no Fourth Amendment violation in returning gunfire and noting that pre-seizure conduct is not subject to Fourth Amendment scrutiny); *Tom v. Voida*, 963 F.2d 952, 962 (7th Cir. 1992) (affirming the grant of summary judgment in favor of the officer for an excessive force claim where an innocent encounter with a teenage male ended in his death after the suspect twice fled, beat the officer's head, and threatened to continue doing so just prior to the officer's shooting the suspect); *Ford v. Childers*, 855 F.2d 1271, 1273+ (7th Cir. 1988) (affirmed grant of directed verdict in finding that the officers acted reasonably in firing shots at a bank robbery suspect fleeing the scene where the officers reasonably suspected he was armed and dangerous); *Sherrod v. Berry*, 856 F.2d 802, 805+ (7th Cir. 1988) (reversing and remanding for a new trial because district judge erroneously allowed the jury to be presented with facts unknown and unavailable to the officers at the time of the shooting, namely that the decedent suspect was unarmed); *Lester v. City of Chicago*, 830 F.2d 706, 710+ (7th Cir. 1987) (reversing grant of summary judgment requiring district court to use Fourth Amendment objective reasonableness standard, rather than substantive due process standard of the Fourteenth Amendment, in considering excessive force in arrest claim).

the facts alleged, there is no need for further inquiry into immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This Court recognizes that the Supreme Court recently granted certiorari to consider whether *Saucier* should be overruled. *Pearson v. Callahan*, --- U.S. ----, 128 S.Ct. 1702 (2008) (directing the parties to "brief and argue the following question: 'Whether the Court's decision in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) should be overruled?'"). In the meantime, the courts continue to apply the sequential approach it prescribed. *See Purtell v. Mason,* 527 F.3d 615, 621-22 (7th Cir. 2008). As a result, the immunity inquiry ends with the finding that the Defendants did not violate any constitutional right of the Plaintiff. Also, any claim against Troopers Meyrose and Larsh in their official capacities[9] cannot survive based on the Court's ruling herein, nor is a claim against the Indiana State Police viable, where no constitutional violation occurred.[10] *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000); *Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998).

## 2.    State Law Claims

It is correct that this Plaintiff in this case has alleged violations of Article I §§ 11, 15, and 16 of Indiana's Constitution, and advanced state law claims under the substantive law of Indiana, including a claim for negligence, to which this Court has supplemental jurisdiction over pursuant to 28 U.S.C. § 1367(a). Because Plaintiff's federal claims have failed to survive summary judgment,

---

9 Plaintiff's counsel asserted for the first time at oral argument that the officers were being sued in their individual *and* official capacities. Yet, Plaintiff's counsel never amended the complaint a second time to allege a claim against the officers in their official capacities, nor did counsel brief the issue during summary judgment. In fact, Plaintiff's Amended Complaint (Doc. No. 19) specifically states that Troopers Meyrose and Larsh are "sued herein (sic) their individual capacities." Amended Complaint, ¶ 2. Such is a proper basis for dismissing the claim now asserted against the Defendant Troopers in their official capacities.

10 Even if the officers violated Plaintiff's constitutional rights, Congress has not abrogated the States' sovereign immunity pursuant to § 1983. *See Quern v. Jordan*, 440 U.S. 332, 342 (1979). Therefore, the Indiana State Police, as an arm of the state, cannot be sued under § 1983. *See, Joseph v. Bd. of Regents of the Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005).

this Court fails to see how the state law claims would be more expediously determined in this Court than in some appropriate state court. Further, it is the firm conviction here that those state law claims should be advanced, prosecuted and tried, if necessary in a court of the State of Indiana. Therefore, the Court declines to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3); *Bean v. Wisconsin Bell, Inc.*, 366 F.3d 451, 456 (7th Cir. 2004). As such, Plaintiff's state law claims are not extinguished, but those claims are now **REMANDED** to the state trial court from whence this case was once removed.

## V. CONCLUSION

Viewing the record in the light most favorable to the non-movant, Ms. Messer cannot demonstrate that Defendants violated Mr. Messer's constitutional rights. To the contrary, the uncontested facts reveal that Defendants' use of force in attempting to subdue Mr. Messer was reasonable when confronted with a shotgun aimed at the officers, and no jury could find otherwise.

Based on the foregoing, Plaintiff's Motion to Strike is **GRANTED IN PART AND DENIED IN PART** (Doc. No. 47), Defendants' Motion to Strike is **DENIED** (Doc. No. 50), and Defendants' Motion for Summery Judgement is **GRANTED** (Doc. No. 38). The Court **DIRECTS** the Clerk to enter judgment in favor of Defendants Indiana State Police, Chad Larsh, and Kevin Meyrose and against Plaintiff Ms. Messer, as administratrix of the estate of Wilmer Messer, on the federal claims asserted in the Amended Complaint. Each party should bear its own costs. The remaining purely state law claims made by Plaintiff shall be **REMANDED** to Jasper Circuit Court in Renssalaer, Indiana.

**SO ORDERED**.
**DATED: November 12, 2008**

/s/ ALLEN SHARP
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**
